## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v | : | Criminal Case No. 07-48-01 (EGS) |
| | : | |
| WILLIAM POYNTER, | : | |
| Defendant. | : | |

### GOVERNMENT'S OPPOSITION TO DEFENDANT'S "MOTION TO DISMISS THE INDICTMENT FOR VIOLATION OF HIS CONSTITUTIONAL RIGHTS TO DUE PROCESS"

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits this opposition to the defendant's Motion to Dismiss the Indictment for Violation of His Constitutional Rights to Due Process (Document 31). In support of this opposition, the United States relies on the following points and authorities, and such other points and authorities that may be cited at a hearing, if any, on the motion.

### I.  Factual Background

In November of 2005, Immigration and Customs Enforcement ("ICE") agents were provided information that the defendant was willing to launder money. The defendant is a certified public accountant who operates an accounting business in an office building in Lanham, Maryland. After receiving this information, ICE authorities initiated an investigation into the defendant's conduct by utilizing a confidential source ("CS") and undercover law enforcement officers. Through a series of meetings with the CS, the undercover officers, and his co-conspirators Christopher Cook and James Franklin Smith,[1] the defendant assisted in laundering money which he believed was proceeds

---

[1] Cook and Smith worked in the same office building as the defendant.

1

from narcotics trafficking.

On November 18, 2005, the CS met the defendant and Cook at the defendant's business office. The CS portrayed himself as a "middleman" for an international narcotics and money laundering group which was looking for ways to launder approximately $500,000 a month in drug proceeds. During the meeting the defendant openly discussed several methods by which he could aid the CS in laundering money. For example, the defendant explained that he could assist in depositing money into bank accounts under the guise of the accounts belonging to "a church that is out of business." The defendant also discussed opening a series of bank accounts, and proposed that "we run a whole bunch of transactions to a whole bunch of places." The CS made clear to the defendant that the money to be laundered would be proceeds from the sale of kilograms of heroin. The defendant stated that Cook, who was present, was "somebody I can trust."

At one point the defendant prepared a document with three columns. In the first column he wrote: "Mortgages," "Long Range," "6  mos – 1 yr"; in the second column: "Offshore Accts," "Camen Islands," "Middle Term"; in the third column: "Small Business," "Non Profits," "Short term," "1 week or less." While preparing this document, the defendant explained that it showed three ways to launder the drug money. During the meeting, the defendant told Cook that he "don't want Frank in it . . . because Frank talk too motherfucking much." (The defendant was referring to co-conspirator James Franklin Smith, who, as set forth below, later assisted in the money laundering scheme.)

The defendant stated that he wanted $1,400 to $1,500 for every $10,000 he assisted the CS in laundering. Also, the defendant wanted $1,000 for each company he set up for the CS. The defendant stated that "Francis" could also assist in the laundering of the drug money. (Francis was

2

later identified as Francis Ayodeji.)

On December 7, 2005, the CS met the defendant and Ayodeji at a Starbucks coffee store in the Chinatown neighborhood of the District of Columbia. This meeting was set up during a series of telephone calls between the CS and the defendant. The defendant, the CS, and Ayodeji entered the Starbucks, but it was too noisy so they left. The three men then entered the defendant's Jeep vehicle and, while driving around the city, discussed laundering money. The CS told the defendant and Ayodeji that he had "way over 6 million . . . . It is dope money." The CS also stated that he had an overseas account in London, England. The defendant told the CS that he could set up a fictitious church and launder $40,000 to $50,000 per Sunday through the church's account. The defendant also raised the idea of laundering money through U.S. post offices. He suggested going to twenty-five or thirty post offices and obtaining $2,000 money orders. The defendant stated, "[o]nce you get that money in your hand that money . . . is clean."

On April 28, 2006, after a series of meetings among the defendant, the CS, Detective Phillip Robinson (acting in an undercover capacity), and Smith, Smith deposited what he believed was the CS's illegal drug revenue. On that day, Smith met with the CS, Det. Robinson, and ICE Special Agent ("SA") Byron Braggs (who, like Det. Robinson, was posing as a member of the drug organization). During the meeting Smith agreed to deposit $28,400 in purported drug proceeds for a fee of $1,600. The CS then provided Smith with wiring instructions and $30,000 in cash. At just after noon on the same day, Smith entered the Bank of America located at 9436 Lanham-Severn Road in Seabrook, Maryland. Smith deposited $28,400 into an account in the name of the True Faith Deliverance Church. The bank employee prepared a Currency Transaction Report ("CTR") in Smith's name. The next day, April 29, 2006, Smith returned to that Bank of America branch and

3

completed the wire transfer of $28,355 ($28,400 less a $45 bank wire fee) into the ICE bank account in London, England.

On June 27, 2006, after a series of further conversations between the defendant and the CS, SA Braggs and the CS met with the defendant and Smith at the defendant's office. At that time, Smith was given $40,000 in cash: $37,500 to be laundered, and $2,500 as commission for the illegal transfer. Later that day, Smith traveled to the same Bank of America branch in Seabrook. Smith entered the bank and conducted the illegal money transfer. Smith deposited $37,500 into the same True Faith Deliverance Church bank account. The bank employee prepared a CTR in Smith's name. Shortly after the illegal money transfer, all of the parties returned to the defendant's office. SA Braggs handed an envelope containing $2,500 in cash to the CS, who in turn handed the envelope to the defendant. Written on the outside of the envelope were "Mr. Poynter" and "$2,500." The defendant then handed the envelope to Smith.

On August 8, 2006, after a series of conversations, the CS and SA Braggs met with the defendant and Smith in the defendant's office. The purpose of the meeting was to launder $60,000. SA Braggs retrieved a bag containing $56,500 in cash and handed the bag to the CS, who then dumped the money onto the defendant's conference table. SA Braggs also retrieved an envelope containing $3,500 with "Mr. Poynter" and "$3,500" written on the outside of it. SA Braggs handed the envelope to the defendant, who then gave it to Smith. That same day, Smith traveled to the BB&T Bank located at 9395 Lanham-Severn Road in Lanham, Maryland. Smith deposited $56,500 into a bank account in the name of the True Faith Deliverance Church. The bank employee prepared a CTR in Smith's name.

On December 20, 2006, after a series of conversations between the CS and Cook, Cook met

4

with Det. Robinson and SA Braggs near Union Station in D.C.  Cook was given $5,000 in cash and

agreed to convert the money into money orders at a nearby post office.  Soon thereafter, Cook

handed a postal employee the $5,000 in cash and requested five $1,000 money orders.  The postal

employee prepared a Funds Transaction Report with Cook's name and address in the area designated

"customer."  After the transaction, Cook provided SA Braggs with the postal receipt and the money

orders.  SA Braggs paid Cook $400 for completing the transaction.

## II.  Discussion

### A.    The defense request to dismiss the indictment is meritless.

The defendant has moved the Court to dismiss the indictment because, he alleges, "the

complaint, indictment and warrant of arrest were procured by intentional misstatement and deliberate

misrepresentation in violation of his constitutional right to due process of law" (Document 31 at 1).

In particular, the defense complains that an affidavit and report prepared by the lead case agent

contain "numerous material statements which are half-truths, misstatements, and a deliberate

misrepresentation of factual occurrences"; "were prepared with the intention to obtain the subject

indictment from the grand jury by any means"; and "amounted to a flagrant abuse of the judicial

process and the constitutional rights of Poynter to due process" (id. at 4-5).  In addition to being

bombastic, these claims by the defense are utterly baseless.

The defense complains that contrary to the assertions set forth in the case agent's documents,

the initial meeting of June 27, 2006 was not pre-arranged; the meetings that day took place not in

the defendant's office but in the office where Cook and Smith worked; and the defendant never

received an envelope that day (id. at 5-7).

The United States maintains that the facts set forth in SA Steven Soggin's documents are

accurate.  The government anticipates that the CS will testify to the pre-arranged nature of the June 27th meeting, and to the fact that the envelope of cash was handed over to the defendant.  In addition, we expect that the CS and SA Braggs will testify that the meetings of that day took place in the defendant's office.  Even assuming arguendo that the meetings took place in the same building but instead in the office where the defendant's co-conspirators Cook and Smith worked, that oversight would be grist for the cross-examination of SA Soggin; it would not, however, even remotely constitute a basis for dismissal of the indictment.  See, e.g., Bank of Nova Scotia v. United States, 487 U.S. 250, 256 (1988) ("[D]ismissal of the indictment is appropriate only if it is established that the violations substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations.") (internal quotation marks omitted); United States v. Thompson, 576 F.2d 784, 786 (9th Cir. 1978) ("Dismissal of an indictment is required only in flagrant cases in which the grand jury has been overreached or deceived in some significant way . . . ."); United States v. Cederquist, 641 F.2d 1347, 1353 (9th Cir. 1981) ("It must be shown that the prosecutor's conduct significantly infringed upon the ability of the grand jury to exercise its independent judgement.").

**B.    The defense has not met its burden to pursue an entrapment defense.**

The defense also requests that the Court "[a]llow defendant's entrapment defense" (Document 31 at 9).  According to the defense, "Poynter further contends and can show that his involvement in this matter was . . . procured through the inducement of government agents" (id. at 7).  Unfortunately for the defendant's cause here, the defense simply has not proffered any evidence of inducement.  Instead, the defense only baldly asserts that "a review of the totality of the circumstances will support defendant's entrapment defense" (id. at 8).

6

"A successful entrapment defense requires two elements: government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct." United States v. Sumlin, 271 F.3d 274, 283 (D.C. Cir. 2001) (internal quotation marks omitted); see also id. at 284 ("[A] defendant must first show that he was induced by the government to commit a crime that he would not have otherwise committed."); United States v. Ramsey, 165 F.3d 980, 985 n.6 (D.C. Cir. 1999) ("To establish entrapment, Ramsey must first show that he was induced by the Government to commit a crime he otherwise would not have committed.  If Ramsey meets his burden, the Government must then prove beyond a reasonable doubt that he was predisposed to commit the crime.").  "A defendant will succeed at this [first] step if he comes forward with some evidence of government inducement."  Sumlin, 271 F.3d at 284 (internal quotation marks omitted). "The government's behavior amounts to inducement when it was such that a law-abiding citizen's will to obey the law could have been overborne."  United States v. Glover, 153 F.3d 749, 754 (D.C. Cir. 1998)  (internal quotation marks omitted).  The District of Columbia Circuit has held "that even repeated government solicitations do not establish inducement unless the requests are coupled with persuasive overtures, or unless there is evidence of reluctance on the defendant's part demonstrating that the repetition of the requests may have moved an otherwise unwilling person to commit a criminal act."  Id. (internal quotation marks omitted).

If the defense is successful at putting forth evidence of inducement, then the burden shifts to the government to disprove entrapment by demonstrating beyond a reasonable doubt that the defendant was predisposed to commit the crime.  "[A] defendant only is entitled to an entrapment instruction when there is sufficient evidence from which a reasonable jury could find entrapment." Id. (internal quotation marks omitted).

In this case, the defendant has simply not yet proffered any evidence indicating that the government induced him into conspiring to commit the crime of money laundering. As such, at this juncture the defendant has not established that he should be entitled to pursue an entrapment defense.

WHEREFORE, for the foregoing reasons, the United States respectfully requests that the Court summarily deny the defendant's motion.

Respectfully submitted,

Jeffrey A. Taylor
United States Attorney
D.C. Bar No. 498-610

/s/

By: _____

Anthony Scarpelli
D.C. Bar No. 474-711
Gregory G. Marshall
N.Y. Bar
Assistant United States Attorneys
555 Fourth Street, N.W., 4th Floor
Washington, D.C. 20530

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused a copy of this pleading to be served upon defense counsel Carrie Crawford, Esquire, this 28th day of September, 2007.

/s/

_____

Anthony Scarpelli
Assistant United States Attorney

9